IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

LINDA L. COOPER                                                                PLAINTIFF

      v.      Civil No. 10-2149

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                          DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Linda Cooper, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for disabled widow's insurance benefits ("DWB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I. Procedural Background:**

The plaintiff filed her applications for DWB on July 30, 2007, alleging an amended onset date of July 1, 2007[1], due to back problems, osteoporosis, arthritis, a heart condition, high cholesterol, high blood pressure, gastrointestinal issues, and depression. Tr. 98-105, 114-115, 140-141, 146-151. Her applications were initially denied and that denial was upheld upon reconsideration. An administrative hearing was held on November 25, 2008. Tr. 17-46. Plaintiff was present and represented by counsel.

At this time, plaintiff was 52 years of age and possessed an ninth grade education. Tr. 23, 62. She has no past relevant work ("PRW") experience. Tr. 62, 124-131.

---

[1]Plaintiff initially alleged disability beginning January 1, 2002. Tr. 20-21. However, at the hearing, Plaintiff amended her onset date to July 30, 2007, because he husband did not die until June 2007. Tr. 20-21.

AO72A
(Rev. 8/82)

On April 2, 2009, the ALJ found that plaintiff's degenerative disk disease of her lumbar spine was severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. Tr. 54-59. After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform light work involving only frequent overhead reaching with her bilateral upper extremities, frequent pushing/pulling with her bilateral upper and lower extremities, climbing, balancing, kneeling, crouching, crawling, stooping, exposure to moving machinery and workplace hazards, and driving; and requiring no transactional interaction with the public. Tr. 59-62. With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a production line assembler, housekeeper, and plastics machine tender. Tr. 62-63.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on September 22, 2010. Tr. 1-4. Subsequently, plaintiff filed this action. ECF No. 1. This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. ECF No. 8, 9.

**II. Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have

decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

To be eligible for DWB, Plaintiff must prove that she is the widow of the deceased worker, has attained the age of 50, is unmarried (unless one of the exceptions of 20 C.F.R. § 404.335(e) apply), and has a disability that began before the month before the month in which the Plaintiff attains age 60, or if earlier, either seven years after the worker's death or seven years after the widow was last entitled to survivor's benefits. *Id*. In this case, the end of the prescribed period, is June 30, 2014.[2]

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial

---

[2] In this case, the wage earner died on June 23, 2007. Tr. 52.

AO72A
(Rev. 8/82)

gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III. Evidence Presented:

Records indicate Plaintiff had a history of depression, post traumatic stress disorder ("PTSD"), lumbago, shoulder pain, osteopenia, and gastrointestinal issues (nausea, diarrhea). Tr. 175-185, 188, 196-203, 206-220, 268-270. The evidence suggests that both her chest pain and her gastrointestinal issues seemed to flare up with increased stress. Tr. 205, 215 A colonoscopy and EGD in 2005 showed colitis and H. Pylori. Tr. 213. Further, in 2006, Plaintiff was treated for atypical chest pain and possible mitral valve prolapse. Tr. 221-227, 313-314. Her condition improved with the addition of Inderal. Although she did not achieve her target heart rate, a stress test revealed no significant ST depression. There was also no evidence of cardiac dysrhythmia or chest pain during the exam. Tr. 221. An echocardiogram also revealed a left ventricular ejection rate of 70% with no evidence of significant valvular abnormalities. Tr. 226-227.

In 2007, Plaintiff was evaluated by cardiologist, Dr. Kamlesh Vluchandani. Tr. 191-194, 204-205. At this time, he noted that her stress test had been negative, she was normotensive with a normal blood pressure, and she had a systolic murmur. Plaintiff was started on Propranolol SA with marked improvement in her symptoms. Tr. 192.

AO72A (Rev. 8/82)

A bone density study conducted in June 2007 revealed osteopenia with very low values and a moderate risk for fracture. Tr. 229. Treatment was advised. Tr. 229.

On July 3, 2007, Plaintiff phoned the Veteran's Administration ("VA") Clinic due to symptoms of depression following the death of her husband on June 23. Tr. 188, 311. She denied suicidal ideations, but indicated that she was having a hard time dealing with the loss. At this time, Plaintiff stated that she was taking Citalopram. Tr. 188.

On July 12, 2007, Plaintiff was treated by Dr. Aye Koko at the VA for depression. Tr. 186-187, 306-310. Treatment notes reveal that Plaintiff was better coping with her husband's death with an increase in her Celexa dosage. She felt less depressed and sad, had regained some interest, and was sleeping better. Her mood swings and irritability had also improved. However, finances and personal issues had not improved as she had hoped. Plaintiff also complained of left hip and leg and right shoulder pain, as well as lower back pain. The pain was reportedly aggravated by bending and lifting. Records indicate she could lift a maximum of 25 pounds. An examination revealed a limited range of motion in her right shoulder and spine. Dr. Koko diagnosed her with depression, lower back pain, and right shoulder pain. He directed her to continue the Celexa and Darvocet and ordered x-rays of her lumbar spine and shoulder. Tr. 186-187. The lumbar x-ray revealed degenerative changes involving the L4-L5 and L5-S1 facet joints bilaterally, but no other abnormalities were noted. Tr. 228. X-rays of the shoulder were within normal limits. Tr. 228.

On July 19, 2007, Plaintiff phoned the VA, reporting that she had experienced an anxiety attack and diarrhea. Tr. 181. She was advised to take Immodium and offered a mental health consultation, which she refused. Tr. 181.

5

On September 7, 2007, Plaintiff followed-up with Dr. Bulchandani. Tr. 301-305. The week prior, she had experienced an episode of tachycardia, which she attributed to stress. She also reported suffering from an anxiety attack and diarrhea when her vehicle was repossessed. Dr. Bulchandani noted that, overall, her chest pains had improved on Propranolol. It was, however, explained that the Propanolol could aggravate her depression, which was currently responding well to medication. Plaintiff also reported diffuse muscle aches, but did not desire treatment for this. Following a normal exam, Dr. Bulchandani increased her Zocor dosage to bring her LDL under reasonable levels. Tr. 301-305.

On December 7, 2007, Plaintiff returned to the cardiologist. Tr. 274. She reported no problems, aside from stress. Tr. 271-274. Her chest pain had resolved with Propranolol, and Dr. Bulchandani noted she was better able to cope with stress. Tr. 271-274.

On January 17, 2008, Plaintiff presented in Dr. Koko's office with reports of chronic diffuse muscle pain, depression, and nightmares. Tr. 388-392. An examination revealed tenderness in the shoulder, arm, gluts, and trochanteric bursa on the left side. Dr. Koko diagnosed her with depression, possible PTSD, and muscle pain possibly related to Simvastatin. He prescribed Celexa and recommended she stop Simvastatin. He indicated that he would check her sedentary rate if the myalgia persisted. Dr. Koko also recommended a mental health consult. Tr. 390.

That afternoon, Plaintiff called for a mental health evaluation for depression. Tr. 386-387. The examiner asked her questions to ascertain her risk for suicide and/or violence. Plaintiff denied current or previous suicidal or homicidal ideations, intent, or attempts. Tr. 386.

On August 28, 2008, Plaintiff saw Dr. Robert Skinner, a gastroenterologist. Tr. 351-358. She reported minimal gastrointestinal symptoms since March 2007. Tr. 355. Plaintiff did

complain of some diarrhea, which she attributed to the consumption of dairy products. Accordingly, she avoided these products. Dr. Skinner recommended that she continue taking Omeprazole and Mesalan1ine and take Lactase before meals. Tr. 357-358.

This same date, Plaintiff was also evaluated by Dr. Koko. Tr. 358-371. Plaintiff had been compliant with her Citalopram with much improvement in her depression. She was helping to raise her Grandson and was "keeping very active." She reported that her back pain was doing okay with Darvocet and the Mesalamine was helping her GI symptoms. Tr. 364. Dr. Koko recommended that she continue taking Fosamax, Vitamin D, and Calcium for osteopenia, as well as Celexa for depression. However, Bactrim was also prescribed to treat a possible urinary tract infection. Tr. 366-367.

On September 5, 2008, allergy testing revealed a low grade allergy to beef and soybeans. Tr. 350-351. It was believed that beef products tended to trigger her diarrhea. Accordingly, a soybean and beef restricted diet was recommended. Tr. 350-351.

On September 24, 2008, a bone density study revealed osteopenia with a moderate risk for fracture. Tr. 333, 346.

On September 30, 2008, Plaintiff was treated in the emergency room for severe abdominal pain that had awoken her from her sleep. Tr. 396-405. She was given pain medication and Phenergan via IV. Tr. 396. No evidence of a bowel obstruction was noted on x-ray. Tr. 405. Plaintiff was diagnosed with abdominal pain and constipation. The doctor gave her a prescription for Norco and recommended Milk of Magnesia or Magnesium Citrate until the pain resolved. Tr. 398.

Upon returning home, Plaintiff phoned the VA with continued complaints of constant pain under her right breast. Tr. 345. She indicated that she had been treated in the ER the previous day

for constipation. At this time, it hurt to cough and move. Plaintiff was advised to have her records faxed to the VA to have an appointment scheduled. Tr. 345.

On May 6, 2008, Dr. Koko completed an assessment of Plaintiff's work-related limitations. Tr. 406-408. He indicated that she could lift and carry 20 pounds occasionally and ten pounds frequently; had no limits on standing/walking/sitting; was limited in pushing/pulling with both upper and lower extremities due to chronic lower back pain and shoulder pain; and, should never climb, balance, kneel, crouch, or crawl. Dr. Koko found her to be unlimited with regard to reaching, handling, fingering, feeling, seeing, hearing, or speaking; and had no environmental limitations. Tr. 406-408.

### IV. Discussion:

Plaintiff contends that the ALJ erred in finding her shoulder impairment, gastrointestinal issues, and mental impairments to be severe; failing to properly evaluate the opinion of Dr. Koko, Plaintiff's treating physician; improperly determining her RFC; and, concluding Plaintiff could perform jobs she could not actually perform. We will begin with an evaluation of the ALJ's credibility findings.

### A. Subjective Complaints:

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing his reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents her from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting her determination that plaintiff's complaints were not fully credible. The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

We note that Plaintiff has alleged a variety of disabling impairments, including back problems, osteoporosis, arthritis, a heart condition, high cholesterol, high blood pressure, gastrointestinal issues, depression, and PTSD. Records do indicate that Plaintiff suffered from osteopenia, or a lower than normal bone mineral density. Her levels were not, however, low

9

enough for a diagnosis of osteoporosis, and medication was recommended to help strengthen her bones. Tr. 229, 333. An x-ray of her lumbar spine revealed degenerative changes involving the L4-L5 and L5-S1 facet joints bilaterally, but no other abnormalities were evident. Tr. 228. Darvocet was prescribed to treat her pain, and Fosamax, Vitamin D, and Calcium were prescribed to treat the osteopenia. Tr. 306-310, 366-367. Thus, it seems clear that Plaintiff's condition required only conservative treatment. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain). An examination in 2007 did show a limited range of motion in her lumbar spine, but more recent exams have revealed no limitations. In August 2008, she even reported to Dr. Koko that her pain was okay with the use of Darvocet.³ *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). Additional evidence also reveals that Plaintiff continued to be "very active," in spite of her alleged pain and discomfort, calling into question her contention of disability.

Plaintiff was also treated for muscle aches and pains on a couple of occasions. However, her doctor believed this was related to taking Simvastatin. Tr. 388-392. Once this medication was stopped, we can find no evidence of any further complaints of muscle aches and pains. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). She did, however, report pain in her shoulder. Tr. 306-310. X-rays of the shoulder were within normal limits. Tr. 228. And, although Dr. Koko noted some tenderness in her shoulder during an examination in January 2008, Plaintiff made no further

---

³We note that Plaintiff testified at the hearing that the medication only dulled her pain a little bit. Tr. 32.

10

complaints of pain after July 2007.[4] *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment).

Plaintiff also suffered from gastrointestinal issues to include nausea and diarrhea. Again, medication was successful in treating her condition. *See Patrick*, 323 F.3d at 596. And, while severe stress does appear to cause occasional flare-ups (*i.e.*, her husband's death, repossession of her vehicle, etc.), we do not find that the evidence reveals a severe impairment that interferes with her ability to perform daily work-related activities. Records indicate that food allergies and a sensitivity to dairy products also contributed to her symptoms. By September 2008, her symptoms had improved with the use of medication and changes in her diet.[5]

In late September 2008, Plaintiff was treated for abdominal pain and constipation. Tr. 396-405. She was advised to take Milk of Magnesia or Magnesium Citrate until the pain resolved. Although Plaintiff phoned the VA with complaints of continued pain, there is no indication that she scheduled an appointment as she was directed to do. And, she received no further treatment for these complaints. Therefore, we can not say that this impairment was disabling.

Records indicate that Plaintiff was evaluated for possible mitral valve prolapse in 2006, when she began experiencing chest pain. However, a cardiac stress test revealed no evidence of cardiac dysrhythmia or chest pain during the exam. Tr. 221. An echocardiogram also revealed a left ventricular ejection rate of 70% with no evidence of shunt or significant valvular

---

[4] We do note Plaintiff's testimony that she could not grip, frequently dropped things, experienced chronic elbow pain, and would have to use her other hand to lower her arm if she raised it above her head. Tr. 30-31.

[5] We note Plaintiff's contention that she had experienced diarrhea causing her to not make it to the restroom on at least three occasions the previous month. Tr. 33. However, a review of the medical records does not indicate that Plaintiff reported this to her doctor. In fact, in September 2008, she denied any such symptoms.

11

abnormality. Tr. 226-227. *See* 20 C.F.R. Pt. 404, subpart. P, App. 1, § 4.04 (listings require a left ventricular ejection fraction of thirty percent or less and a cardiologist's conclusion that the performance of an exercise test will present a significant risk to the individual). Further, no evidence of mitral valve prolapse was noted. Plaintiff was prescribed high blood pressure medications and her condition improved. Tr. 301-305. *See id*. In early 2007, Plaintiff was noted to be normotensive, with a normal blood pressure. By September 2007, she reported no further chest pain. Tr. 271-274.

The record also reveals that Plaintiff was prescribed medication to treat her high cholesterol. Tr. 301-305. However, we can find no evidence to show that this condition was severe, or that it interfered with her ability to perform work-related activities. *See id.*

Plaintiff was also diagnosed with depression, following the death of her husband. We note that she was treated by her primary care physician, rather than a mental health professional. This lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental impairment. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007). Plaintiff contends that she did not obtain mental health treatment because she could not afford it. However, the record does not support this contention. There is no evidence to indicate that Plaintiff was ever refused mental health treatment due to her inability to pay or that she sought out low cost or indigent mental health services. *See Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir.1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty); *Hutsell v. Sullivan,* 892 F.2d 747, 750 n. 2 (8th Cir.1989) (noting that "lack of means to pay for medical services does not *ipso facto* preclude the Secretary from considering the failure to seek medical attention in credibility

12

determinations.") (internal quotations omitted). Accordingly, we do not find her failure to obtain treatment to be excused.

It is also significant to note that her depression responded well to medication. *See Patrick*, 323 F.3d at 596. By December 2007, her doctor noted that she was better able to cope with stress. Tr. 271-274. In January 2008, Plaintiff underwent a telephone evaluation for depression. At that time, she denied current or previous suicidal or homicidal ideations, suicide intent, and suicide attempts. Tr. 386. Accordingly, we can not say the ALJ erred in concluding that her depression was not severe.

There is also some evidence to indicate that Plaintiff was diagnosed with possible PTSD on one occasion. Tr. 388-392. At this time, she also reported suffering from nightmares involving deceased persons. At the hearing, Plaintiff testified that three of her children had passed away soon after birth. Apparently, her husband and the children were in her dreams. We can not, however, find any evidence to indicate that Plaintiff sought out consistent treatment for nightmares/PTSD or that she voiced frequent complaints of her symptoms. *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure of claimant to maintain a consistent treatment pattern for alleged mental impairments is inconsistent with the disabling nature of such impairments). Accordingly, we can not say that her condition was as severe as alleged.

Although Plaintiff testified that her medications made her drowsy, we can find no objective evidence to support this contention. Plaintiff reported no significant medication side effects to her doctors. *See Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004) (alleged side effects were properly discounted when plaintiff did not complain to doctors that her medication made concentration difficult). Had her medications made her drowsy enough to interfere with her ability to perform daily activities, we believe she would have discussed this matter with her doctor.

13

Accordingly, we can not say the ALJ erred in discrediting her testimony in this regard. Plaintiff's reported activities also undermine her claim for disability. On an adult function report, she reported the ability to care for her six year old grandson, care for her animals (at least seven cats and a dog), care for her personal hygiene (with some reported pain and discomfort), prepare meals, wash clothing, clean the house, mow using a riding mower, go outside daily, drive a car, go out alone, shop in stores for food, pay bills, count change, handle a savings account, use a checkbook/money orders, read, watch television, watch her grandson play sports, and talk on the phone. Tr. 132-136. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). In March 2007, Plaintiff reported that she had been playing ball when she slid on gravel, injuring her right hand, left knee, and right elbow. Tr. 211. Plaintiff also reported that her Grandson spent a great deal of time in her care, as she was essentially raising him. Tr. 33-34. Further, in August 2008, she stated that she was keeping "very active." Tr. 358-371. We find these statements to be inconsistent with her complaints of disabling pain. Clearly, these activities do not support plaintiff's claim of disability.

Therefore, although it is clear that plaintiff suffers from some degree of impairment, she has not established that she is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or

14

discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning her daily activities support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

The evidence also indicates that Plaintiff had only minimal earnings between 1991 and 1994. In 1994, she stopped working to care for her ill husband. This raises a question as to whether or not her unemployment was actually due to medical impairments. *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (stating lack of work history may indicate lack of motivation to work, rather than lack of ability).

**B.     Non-Severe Impairments**:

Plaintiff contends that the ALJ erred in concluding that her shoulder impairment, gastrointestinal issues, and mental impairments were not severe. An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. *See Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *id.* at 158, 107 S.Ct. 2287 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a). If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir.2007). Thus, alleged impairments may not be considered severe when they are stabilized by treatment or are otherwise unsupported by the medical record. *Johnston v. Apfel,* 210 F.3d 870, 875 (8th Cir.2000); *see also Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir.2000) (plaintiff bears the burden to establish severe impairments at step-two of the sequential evaluation).

As previously noted, the record does not support the existence of a medically determinable shoulder impairment. While Plaintiff did complain of pain on a few occasions, her treatment for alleged pain was inconsistent, at best. Aside from tenderness on one occasion, objective tests and physical exams revealed no significant abnormalities. As such, we do not find error in the ALJ's determination that this impairment was non-severe.

Likewise, we find no fault with the ALJ's conclusion that Plaintiff's gastrointestinal issues were non-severe. While the evidence does suggest that these problems were somewhat situational in nature, *i.e.*, in response to stress and the death of her husband and the presence of beef, soy, and dairy products in her diet, this condition responded well to medication. *Johnston,* 210 F.3d at 875. Plaintiff contends that her condition would at times necessitate unscheduled and frequent bathroom breaks. However, we can find no evidence in the record to support this contention.[6] Accordingly, we find substantial evidence supports the ALJ conclusion that this impairment was non-severe.

Plaintiff's mental impairment was also properly found to be non-severe. Here again, the depression was related to the death of her husband and the severe stress that followed his death. It responded well to medication, so much so that her doctor commented that her ability to handle stress was even improving. Plaintiff did not seek out mental health treatment, and reported no suicidal ideation, intent, or plans. She denied having any problems getting along with authority figures, reported that she was helping to raise her grandson, and indicated that she continued to live a "very active" life. Tr. 137-138, 358-371. We find these abilities to be inconsistent with her

---

[6]Counsel's contention that Plaintiff recently reported to Dr. Skinner that she continued to have up to three diarrhea episodes per week is misplaced. A review of the record reveals Plaintiff made that report in 2005. And, her condition then improved via medication. Tr. 214-215.

16

allegations of severe and disabling depression. Accordingly, the ALJ's non-severe determination is supported by substantial evidence.

### C. RFC Assessment:

We next turn to the ALJ's determination that plaintiff had the RFC to perform light work involving only frequent overhead reaching with her bilateral upper extremities, frequent pushing/pulling with her bilateral upper and lower extremities, climbing, balancing, kneeling, crouching, crawling, stooping, exposure to moving machinery and workplace hazards, and driving; and requiring no transactional interaction with the public. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

In the present case, the ALJ carefully reviewed the medical records, plaintiff's subjective complaints, plaintiff's testimony regarding her daily activities, and the functional limitations set forth by the physicians. On August 17, 2007, Dr. Ronald Crow completed a physical RFC assessment. Tr. 239-246. After reviewing Plaintiff's medical records, he concluded Plaintiff could

perform a full range of light work. Tr. 239-246. This assessment was affirmed by Dr. Jerry Mann on December 17, 2007. Tr. 328.

On August 25, 2007, Dr. Paula Lynch completed a psychiatric review technique form. Tr. 249-262. She also reviewed Plaintiff's medical records and diagnosed Plaintiff with depressive disorder not otherwise specified, bereavement. Dr. Lynch was of the opinion that Plaintiff would have only mild limitations in all areas of functioning and noted no episodes of decompensation. Tr .249-262. This assessment was affirmed by Dr. Jerry Henderson on December 17, 2007. Tr. 329.

We also note Dr. Koko's assessment dated May 6, 2008. Tr. 406-408. However, after reviewing the record in this case, we agree with the ALJ's conclusion that Dr. Koko's opinion is not consistent with the evidence. Dr. Koko concluded Plaintiff should never climb, balance, kneel, crouch, and crawl, due to her back and shoulder pain. However, in March 2007, she was reportedly playing ball. Plaintiff also indicated that she was raising her young grandson, perform various chores around the house, watching her grandson play sports, and leading a "very active" lifestyle. We find these activities to be inconsistent with a finding that she could never perform the aforementioned activities. Accordingly, the ALJ's decision not to give Dr. Koko's opinion controlling weight is supported by substantial evidence.

Plaintiff also takes issue with the ALJ's conclusion that she could frequently reach overhead with both upper extremities and push/pull with upper and lower extremities bilaterally. She contends that this is inconsistent with Dr. Koko's opinion that she was "limited" in these areas. We do note Dr. Koko's finding in this regard. However, he provided no definition of the term limited, so it is difficult to discern the amount of restriction allegedly arising from this impairment. We also note Plaintiff's level of activity and the fact that she sought out inconsistent treatment for

her alleged shoulder pain. A limited range of motion was noted in the shoulder in 2007 with no other abnormalities noted until 2008, when her shoulder was noted to be tender on one occasion. Accordingly, while we do believe she had some mild limitations with regard to the shoulder, we find that substantial evidence supports a finding that she could frequently (2/3 of the day) reach overhead and push/pull.

Plaintiff also contends that the ALJ's assigned RFC does not account for her non-exertional impairments. Specifically, she alleges that he should have obtained a consultative mental evaluation to determine her mental limitations. *C.f., Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) (holding ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled); 20 C.F.R. §§ 404.1519a(b) and 416.919a(b) (2006). Plaintiff did carry a diagnosis of depression. The medical evidence reveals that she had no history of mental health treatment, inpatient or outpatient, opting to receive only medication from her general doctor. And, her depression responded well to the medication, showing notable improvement. In fact, Plaintiff even denied a history of suicidal ideations and/or attempts, reported no problems getting along with authority figures, and denied ever having been fired due to problems getting along with others. While she did complain of some panic attacks around the time of the hearing, this is not documented in the medical and no treatment for any such symptoms was ever administered. Accordingly, while we do believe her mental limitations limited her ability to perform work involving transactional interaction with the public, we do not believe that it resulted in any greater limitations or prevented her from performing the range of work identified by the ALJ. And, we do not find that the ALJ's failure to order a consultative evaluation constituted reversible error. The record contained substantial evidence in support of the ALJ's assessment.

19

### D.     Jobs Available:

We also find that substantial evidence supports the ALJ's finding that plaintiff can perform work that exists in significant numbers in the national economy. The vocational expert testified that a person with Plaintiff's RFC could perform work as a production line assembler, housekeeper, and plastics machine tender. Tr. 40-42. *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).

Plaintiff contends that the ALJ's conclusion that she could return to work that exists in the national economy is misplaced because she failed to include all of her limitations in the hypothetical posed to the vocational expert. We note, however, that the ALJ is only required to include those limitations in his hypothetical which she finds to be credible. *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005). The hypothetical question posed by the ALJ in this case incorporated each of the physical and mental impairments that the ALJ found to be credible, and excluded those impairments that were discredited or that were not supported by the evidence presented. Accordingly, we find no error.

### V.     Conclusion:

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 8th day of December 2011.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)